HAWTHORNE, Justice.
 

 Relatrix in this case, Mrs. Pauline Guinn, instituted habeas corpus proceedings against respondent, Mrs. Dixie Watson, to obtain the care and custody of relatrix’ illegitimate child, a girl three years old at the time the case was tried in the court below, now about six years of age. The lower court, after a trial on the merits, rendered judgment rejecting relatrix’ demands and recalling, vacating, annulling, rescinding, and setting aside the writ of habeas corpus theretofore granted. From this judgment relatrix appealed to this court.
 

 The little girl whose custody relatrix seeks in these proceedings was born in the Memorial Mercy Home Plospital in the City of New Orleans on August 22, 1940. For some time prior to the birth of the child, the mother, who was unmarried, was employed in Alexandria as a hat-check girl in a night club, as a clerk in a department store, and as a waitress in various restaurants. After the child’s birth, the mother returned to Alexandria, leaving the child at the hospital, and did not see her daughter, insofar as the record discloses, until some time in March, 1941, when the child was about six months old. At that time relatrix went to New Orleans, and, as her counsel state in brief, upon her representation to the hospital authorities that' she was taking the child to the home of her sister, she was permitted to have the baby, whom she took to Alexandria to the home of her landlady, where she was renting a room. A few days thereafter, relatrix’ sister and her aunt took the infant child to the home of relatrix’ parents in Grant Parish, near Alexandria. The evidence is conflicting as to what happened on this occasion, but relatrix’ father admits that he refused to take the child. He testified on the trial that he “did not want that child here”, giving thereafter
 
 *270
 
 as his reasons that he was trying to make a crop and did not see how he could care for the baby at that time.
 

 The infant was then taken back to relatrix in Alexandria and shortly thereafter was placed in the custody and care of Mrs. Dixie Watson, respondent herein, in whose care and custody the child has been ever since — for a period of two and one-half years at the time of the trial in September, 1943, and for a period of about five years at the present time.
 

 Relatrix was about 20 years of age at the time the child was born. After her return from New Orleans with the child in March of 1941, she was employed (until the date of her marriage) in Alexandria at various cafes, restaurants, laundries, and a bowling alley. She states that it was her intention at the time of her return from New Orleans to place the child in the care and custody of her parents, who refused to accept the child, as herein-above set forth. She actually kept the child with her only a few days before placing her in the care of respondent, who took the baby to her home of her own free will and with her husband’s consent.
 

 On January 17, 1942, relatrix married Leroy Guinn. The child whose custody is. the object of these proceedings was at tjjat time about one and one-half years of age. After the marriage, the mother and her husband (except for a period of approximately one month during which they were in Oklahoma) maintained a home in Alexandria and lived together until January 2, 1943, when Mr. Guinn was inducted into the Armed Forces of the United States. During this period of time, which was almost a year, relatrix’ husband was steadily -employed with the exception of a short interval, and relatrix did not work.' After her husband entered the Armed Forces, she resumed employment at a laundry in Alexandria, where she was still employed at the time this suit was instituted on August 31, 1943, her husband being at that time with the Armed Forces in North Africa.
 

 The rule in this state seems to be clear that the mother has a superior right to the custody of her child over third persons, but that this right must yield to the superior right of the State to deprive her of the care and possession of her child in the event the physical, mental, and moral welfare of the child requires it. State ex rel. Castille v. Cooke et al., 183 La. 404, 164' So. 153, and authorities therein cited.
 

 In the case of State ex rel. Harris v. McCall et ux., 184 La. 1036, 168 So. 291, 292, this court said: “Although parents have a natural right to the custody of their children, nevertheless the state has 'an interest in children which goes beyond the mere parental right. In all cases involving their custody, the welfare of the children must be considered, and should prevail over the mere parental right to their possession. State v. Dartez, 154 La. 722, 98
 
 *272
 
 So. 164; State v. Stanga, 161 La. 978, 109 So. 783; Davis v. Willis, 169 La. 13, 124 So. 129; State v. Spiers, 170 La. 454, 128 So. 275.”
 

 The rule set out hereinabove, that is, that the welfare of the child is of paramount importance in determining who is entitled to custody of the child, has consistently been followed by the courts of this state. State ex rel. Castille v. Cooke and State ex rel. Harris v. McCall, supra; State ex rel. Lassere v. Michel et al., 105 La. 741, 30 So. 122, 54 L.R.A. 927; Ex parte Ryan, 126 La. 449, 52 So. 573; State ex rel. Peter v. Stanga et ux., 161 La. 978, 109 So. 783; Davis v. Willis et al., 169 La. 13, 124 So. 129; State ex rel. Stockstill v. Spiers et ux., 170 La. 454, 128 So. 275.
 

 Counsel for respondent cite and call to .our attention the case of United States ex rel. Schneider v. Sauvage et ux., 3 Cir., 91 F. 490, 492, in which case the court, in •discussing the law with reference to the ■custody of a minor child, in our opinion very wisely and properly said: “The general trend of the best-considered decisions of our American courts seems to be that when a child of tender years has been surrendered by its parent or parents to the care of another, where the new relationship has been allowed to continue a number of years, and the duty of a parent, in care, in nurture, and in affection, has been faithfully rendered by the foster parents, the courts will not give any active aid to the parent to reclaim the custody of the surrendered child, if convinced that the child will be properly cared for by the foster parents, and the child is content to stay. It will be noted that the first and principal inquiry, the ‘polestar,’ as it has been said, by which the courts are guided, is, what is far the best interests of the child? The several rights of the parent and foster parent are secondary to this principal question. That the welfare of the child, rather than the supposed absolute right of the parent, is the end the court seeks, is clear. * * *"
 

 The rule that the mother has a superior right to the custody of her children applies to illegitimate children- as well as to legitimate children, and no distinction is made with reference to her rights in either respect. Revised Civil Code, Article 256. However, her rights in either case are not absolute but must yield to the welfare and best interest of the child.
 

 At the time of the trial of this suit in the lower court, relatrix testified that it was her intention to secure the custody of the child in this proceeding and place her in the care and keeping of her parents, who, according to their testimony, were then ready, willing, and able to rear the child, although relatrix’ father had previously refused to take the child when she was about six months of age, when relatrix took her to Alexandria from New Orleans.
 

 In brief counsel state that, since the case was tried in the lower court, relatrix’ hus
 
 *274
 
 band, who has been discharged from the Armed Forces and has returned home, has urged his wife to obtain the child in order that they may rear her as their own. However, we do not have the benefit of his sworn testimony in the record. But, conceding that he would so testify, we do not see how his testimony on this point could in any way change our view with reference to the custody of the child under the facts and circumstances disclosed by the record we now have before us.
 

 Respondent, Mrs. Dixie Watson, who gave her age as 39 in her testimony in the lower court, lived with her husband, John S. Watson, aged 45 at the time of the trial, in Corpus Christi, Texas. Her husband was employed as an electrician under civil service at the Naval Air Base there and was earning a salary of $60 per week. The record discloses that they occupied a modest home with modern conveniences, and were persons of excellent character, reputation, and conduct. These persons, who have no children of their own, have cared for this little girl since she was about six months old, in health and in sickness, and have accumulated savings for her future benefit. They have always treated her as if she were their own, and she bears their name and calls them “Mother” and “Daddy”. In their custody the child has received the very best of attention and the tenderest care and affection.
 

 The proof is conclusive that these foster parents love the little girl as if she were their own, and they not only have looked after the physical welfare of the child since her infancy, but are interested in her spiritual welfare in their efforts to rear her to be a good, conscientious, Christian' woman. They testified that it was their intention to adopt the child as their own. These people have had the care and custody of the child for about five years, and during this time the child has been wells cared for, well provided for, and treated with love and affection.
 

 It is the intention of Mr. and Mrs. Watson, in the event the court should deny relatrix’ prayer for custody of this little girl,, to rear her in Corpus Christi, Texas, where they testified they intend to make their permanent home, and where their friends and> acquaintances and the present and future associates of the little girl do not know, and are not likely to learn, that she is an-illegitimate child. On the other hand, the: record discloses that this fact is known to*’ the friends and associates of the mother in and near Alexandria, where relatrix testified that she intends to rear the child in the event the court awarded her the care- and custody of her daughter.
 

 The mere fact of the illegitimacy of tfe child does not affect the mother’s- rights as to her care and custody, for, as we have stated above, the rule as to the mother’s-rights to the custody of her children applies both to illegitimate as well as to legitimate children. However, in the instant case, we are considering not only the moth—
 
 *276
 
 ér’s rights, but also the future welfare and best interest of the child.
 

 Up to the time of the trial, relatrix had seen the.child only a few times, and for short intervals, and she is practically a stranger to her. Prior to Leroy Guinn’s induction into the Armed Forces, respondent and the child visited the home of relatrix and her husband, and, according to testimony which was not denied, during this time the little girl was taught at her stepfather’s request to call him and her mother “Uncle Leroy” and “Aunt Polly”. These parties evidently did not have any-intention at that particular time of making an effort to obtain the care of the little girl.
 

 It is true that during most of the time since the child’s birth the mother was unable due to her financial condition to care and provide for the child. This fact alone should not be construed against her, as the financial ability of the parties is not usually a fact to be considered in determining the right of a mother to the custody and care of her minor children. However, in considering' any case involving the custody of a child, all the facts and circumstances should bé considered to ascertain what is to the child’s best interest and welfare.
 

 Relatrix cites ?• d relies on the cases of State ex rel. Wilson et al. v. Pierre, 155 La. 510, 99 So. 421, and State ex rel. Martin et al. v. Talbot et ux., 161 La. 192, 108 So. 411. These cases, however, are easily distinguishable from the case at bar.
 

 In the Pierre case, the mother went to New Orleans to give birth to an illegitimate child. After the birth of the child, the mother was 'employed by respondent, Sallie Pierre, in whose home she and her child lived. When the child was about five months old, the mother left her at respondent’s home and went to Natchitoches for a visit. She remained there' about six months, at the end of which time she returned to New Orleans and took up her abode and residence with respondent. She subsequently married the father of the child and shortly thereafter instituted proceedings for the care and custody of her child. She was joined therein by her husband, both claiming that they were, respectively, the mother and father of said child. The main defense of respondent was that the child had been abandoned- by the mother and consequently was a foundling under the provisions of the Civil Code.
 

 This court,. in awarding the care and custody of the child to relators, found that the child had not been abandoned and was not a foundling. In that case the question of the welfare and best interest of the child was not raised or decided.
 

 In the Talbot case, the child’s father had deserted her and her mother, and the mother had placed the child in her sister’s
 
 *278
 
 home because she herself was unable to care and provide for her. The mother obtained a divorce from the child’s father and thereafter remarried. The proceedings were instituted by the mother and the stepfather to regain custody of the child.
 

 A careful analysis of that case clearly shows that the interests and welfare of the child could be served equally as well in the home of her mother and stepfather as in the home of her aunt and uncle, and under these circumstances this court properly awarded the custody and care of the child to her mother and stepfather.
 

 Our learned brother below, who heard and observed all the witnesses, dismissed relatrix’ suit and denied her the care and custody of the child, stating that he was of the opinion that the child’s interest and welfare would best be served by leaving her status undisturbed at that time. After a careful study of the entire record, we cannot say that he erred in this respect.
 

 This court, in reviewing decisions of the lower courts involving the custody of children, has said that reasonable latitude must be left to the trial court in such cases, and that its views upon the facts surrounding any given case are entitled to great weight. State ex rel. Johnson v. Johnson et al., 149 La. 89, 88 So. 698; Davis v. Willis et al., 169 La. 13, 124 So. 129; State ex rel. Castillion v. Jeunesse, 185 La. 845, 171 So. 51.
 

 For the reasons assigned, the judgment' appealed from is affirmed; relatrix to pay all costs.
 

 O’NIELL, C. J., absent.